JOHNATHAN E. NUECHTERLEIN
General Counsel

KORIN EWING FELIX
Federal Trade Commission
600 Pennsylvania Ave. NW
Mail Drop CC-9528
Washington, DC  20580
(202) 326-3556
(202) 326-3197 (Facsimile)

ATTORNEYS FOR PLAINTIFF
FEDERAL TRADE COMMISSION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**<br><br>**Plaintiff,**<br><br>v.<br><br>**HCG DIET DIRECT, LLC; and CLINT ETHINGTON,**<br><br>**Defendants.** | Civil Action No.  2:14-CV-00015-NVW<br><br>**FEDERAL TRADE COMMISSION'S MOTION TO LIFT SUSPENSION OF JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF** |

Defendants HCG Diet Direct, LLC, and Clint Ethington materially misrepresented their financial condition in sworn statements submitted to the Federal Trade Commission ("FTC" or "Commission") to settle this case. The Commission agreed to settle the matter with a $3,212,310.00 suspended judgment based on the "truthfulness, accuracy, and completeness of [these] sworn financial statements and related documents (collectively 'financial representations')." (Dkt. #5, Stip. Jgmt. at 11.) Upon motion by the Commission, the suspension may be lifted as to any Defendant if the Court finds that Defendant "failed to disclose any material asset, materially misstated the value of any asset, or made any other material misrepresentation or omission in the financial representations . . . ." (Dkt. #5, Stip. Jgmt. at 12.)

Defendants now admit that their financial representations included numerous misstatements and omissions. Indeed, they have provided entirely new and different information regarding their early 2013 financial conditions. But even this new information contains numerous misstatements and omissions. The bottom line is Defendants had substantial financial assets they hid from the Commission in 2013. Because they failed to disclose material assets and made material misrepresentations and omissions in their financial representations, the FTC hereby moves the Court to lift the suspension and hold Defendants jointly and severally liable for the full monetary judgment of $3,212,310.00, plus interest accrued since January 7, 2014. *See id.* at 11-12.

1

## I.     DEFENDANTS' 2013 FINANCIAL REPRESENTATIONS

In April and June 2013, Defendants submitted financial statements claiming that they could not pay *any portion* of the $3.2 million in consumer injury they caused.

### A. Ethington's 2013 Individual Financial Representations

In his April 18, 2013, individual statement, Clint Ethington identified a single source of income – Ethington Management, Inc.  (Attach. A, Declaration of Crystal Ostrum, Ex. 1 at 2.)  Specifically, Ethington stated that his spouse received a $50,000 annual salary from Ethington Management, and that he had received $6,600 in income from the company from January through April 18, 2013.  (*Id.* at 1-2, 5.)

In addition, Ethington indicated that he owned two houses, but each was mortgaged beyond its market value, and that he and his wife each had a leased vehicle.  (*Id.* at 6-7.)  Beyond that, Ethington indicated he had minimal assets – less than $2,000 in various bank accounts, and just over $7,500 in furniture and related household goods – as well as significant liabilities, including credit card debt and tax payments owed from prior years.  (*Id.* at 4, 6-7.)  Ethington swore he owned 50% of Ethington Management, Inc., and 33% of PRE Properties, LLC.  (*Id.* at 5.)  However, he listed no assets for either company.  (*Id.* at 9 (showing nothing listed for assets from the non-public business and financial interests).)

Ethington also provided a balance sheet showing combined current monthly income and expenses for himself, his spouse, and his dependents.  He listed $5,000 per month in after-tax salary and $3,416 per month in distributions from Ethington

Management, totaling $8,416 per month. (*Id.* at 9.) Ethington listed his expenses as mortgage payments, rental property expenses, automobile lease payments, food and clothing expenses, utilities payments, health insurance costs, and back federal taxes, totaling $11,684.14 per month. (*Id.* at 9-10.) Ethington thus represented that his expenses exceeded his income by $3,268.14 each month.

### B. HCG Diet Direct's 2013 Financial Representations

In its corporate financial statement, HCG Diet Direct stated that it had less than $3,000 in cash on hand[1] and no other significant assets or sources of income. (Attach. A, Ostrum Dec., Ex. 2 at 9, 11.) According to its Profit and Loss Statement, the company earned less than $13,000 in net income from January through March 2013. (Attach. A, Ostrum Dec., Ex. 3 at 7.)

Item 8 of the corporate financial statement required HCG Diet Direct to identify all corporations, partnerships, and other business entities in which HCG Diet Direct's members and managers – identified previously as Ethington Management, Inc.; Live Beyond, LLC; Clint Ethington; and Lauren Ethington – had an ownership interest. (Attach. A, Ostrum Dec., Ex. 2 at 4.) In response, HCG Diet Direct listed:

- Ethington Management, LLC (50% Clint Ethington; 50% Lauren Ethington)
- PRE Properties, LLC (33% Clint Ethington)

---

[1] In 2013, HCG Diet Direct held another bank account at Bank of America. Defendants failed to disclose even the existence of this bank account, which had a balance of less than $1000 in April 2013. (Attach. A, Ostrum Dec., Ex. 2 at 9 (failing to list a Bank of America account); Ex. 7 at 12 (showing balance in April 2013).)

- HCG Diet Direct, LLC (50% Ethington Management)
- Optimize, LLC (50% Ethington Management)
- Growth Hormones Direct, LLC (50% Ethington Management)
- Easy Payment Services, LLC (50% Ethington Management)
- NovusOP, LLC (50% Ethington Management)
- Prescription HCG, LLC (50% Ethington Management)
- DietRedi, LLC (50% Ethington Management)

(*Id.* at 16.)[2]  HCG Diet Direct also stated that NovusOP, Prescripton HCG, and DietRedi were not active businesses.  (*Id.*)  In a letter dated June 13, 2013, Defendants responded to the FTC's request for additional information on any financial or non-financial assets held by these related companies, stating:

> You have asked about whether the following entities have any financial or non-financial assets:
>
> Ethington Management, Inc.
> Optimize, LLC
> Growth Hormones Direct, LLC
> Easy Payment Services, LLC
> NovusOP, LLC
> Prescription HCG, LLC
> DietRedi, LLC[3]
>
> These entities were listed on the Attachment for Item 8 on the Financial Statement submitted earlier.  With the exception of Optimize, LLC, none of these entities has any financial or non-financial assets.  Optimize, LLC does not have any financial assets, but it does own some computers and desks that are worth no more than $3,000 to $4,000 and are what its employees use daily.

(Attach. A, Ostrum Dec., Ex. 4.)

---

[2] Seth Hassell, through a series of wholly-owned businesses, owned the remaining 50% of HCG Diet Direct, Optimize, Growth Hormones Direct, Easy Payment Services, NovusOP, Prescription HCG, and DietRedi.  (Attach. A, Ostrum Dec., Exs. 35-49.)

[3] Hereinafter, these companies will be referred to collectively as the "related companies."

## II. DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS

Defendants' 2013 financial representations are replete with misrepresentations and omissions. Contrary to their sworn statements, Defendants had significant assets that they could have used to reach a financial settlement with the Commission. But Defendants instead *chose* to hide those assets from the Commission and to put many of them – directly or indirectly – into the pockets of Ethington and his business partner, Seth Hassell. Indeed, financial records the FTC has obtained show the following misrepresentations and omissions:

- When Ethington signed his April 18, 2013, individual financial statement identifying *zero* financial assets from non-public business and financial interests, the companies owned in whole or in part by Ethington actually held over $150,000 in their bank accounts. (Attach. A, Ostrum Dec., Ex. 1 at 9; Ex. 7 at 14; Ex. 8 at 17; Ex. 9 at 22; Ex. 13 at 19; Ex. 14 at 14; Ex. 15 at 15; Ex. 16 at 12; Ex. 17 at 11; Ex. 18 at 12; Ex. 19 at 5.)
- The day before Ethington signed his financial statement, he and Hassell paid more than $120,000 from the Optimize bank account toward various credit cards. (Attach. A, Ostrum Dec., Ex. 9 at 21; Ex. 10 at 3; Ex. 27 at 3**;** Ex. 34.)
- Ethington received approximately $15,000 in monthly income from Ethington Management, almost twice the amount he claimed. (*See infra* at 8, 10-11.)
- On June 13, 2013, when Defendants attested they had *zero* financial assets and no more than $4,000 in non-financial assets, the related companies actually had

- over $65,000 in their bank accounts and $140,000 in other assets. (Attach. A, Ostrum Dec., Ex. 4; Ex. 8 at 20; Ex. 9 at 33; Ex. 14 at 20; Ex. 15 at 21; Ex. 16 at 17; Ex. 17 at 12; Ex. 18 at 14; Ex. 19 at 6; Ex. 30 at 2; Ex. 33 at 2.)

- From January through August 2013, Ethington and Hassell received more than $200,000.00 in distributions from their jointly-owned businesses, including more than $120,000 from Optimize, money they took for their personal benefit and that could have been used in a financial settlement. (*Id.*, Ex. 2 at 14; Ex. 13 at 5-29; Ex. 14 at 8-32; Ex. 15 at 8-26; Ex. 22 at 5; Ex. 21; Ex. 23 at 12, 15-16; Ex. 29.)

- Despite presenting itself as a company on the verge of shutting down, HCG Diet Direct received payments from a merchant account through April 8, 2013, and opened a new merchant account immediately after submitting its April 23rd financial statement. (*Id.*, Ex. 13 at 5-22, 25-29.)

**A. FTC Investigation**

In 2015, the FTC investigated the truthfulness and accuracy of Defendants' 2013 financial representations, after learning that Optimize, one of the related companies, sold its share of a separate business, Zookaware, LLC, in early 2013 and received payments totaling $315,000 ("Zookaware settlement"). (*See* Attach. A, Ostrum Dec., Ex. 28, 5/13/15 Declaration of Clint Ethington, ¶ 8.[4]) Indeed, Optimize received the final

---

[4] Although Defendants marked certain documents "Confidential," the parties have not entered into a confidentiality agreement, and there is no protective order in place in this

$265,000 on April 10, 2013, only eight days before Ethington signed his financial statement and less than two weeks before HCG Diet Direct's financial statement. (*Id.*; Ex. 9 at 20 (Optimize bank statement showing deposit of $265,000 on April 10, 2013).)

As part of its investigation, the FTC subpoenaed bank records for the relevant companies. Those financial records show that, on April 18, 2013, when Ethington signed his financial statement saying he had no money, the related companies' bank accounts held $148,022.45, not including money held by HCG Diet Direct.[5] (Attach. A, Ostrum Dec., Ex. 8 at 17; Ex. 9 at 22; Ex. 14 at 14; Ex. 15 at 15; Ex. 16 at 12; Ex. 17 at 11; Ex. 18 at 12; Ex. 19 at 5.) On April 23, 2013, when Ethington signed HCG Diet Direct's financial statement, these accounts held $125,590.86. (*Id.*, Ex. 8 at 17; Ex. 9 at 22; Ex. 14 at 14; Ex. 15 at 15; Ex. 16 at 12; Ex. 17 at 11; Ex. 18 at 12; Ex. 19 at 5.) And, on June 13, 2013, when Defendants certified that these companies had "no financial assets," their bank accounts still held $65,393.64. (*Id.*, Ex. 8 at 20; Ex. 9 at 33; Ex. 14 at 20; Ex. 15 at 21; Ex. 16 at 17; Ex. 17 at 12; Ex. 18 at 14; Ex. 19 at 6.)

### B. Defendants' Admissions

Upon learning of the FTC's investigation, Defendants conceded numerous "mistakes" in their 2013 financial statements and provided a declaration from Clint Ethington, with attachments, setting forth new numbers for the Ethingtons' income and

---

case. Moreover, as set forth in Ms. Ostrum's Declaration, the parties agreed on what information would be redacted from exhibits filed in support of this motion. (*See* Attach. A, Ostrum Dec., ¶5.)

[5] This number does not reflect money held by PRE Properties, LLC, as the FTC has not yet obtained financial records for that company.

the related companies' assets. (Attach. A, Ostrum Dec., Ex. 28, 5/13/15 Ethingon Dec.) Ethington now claims he "did not properly focus" on the language of the financial statement and "misinterpreted" terms like "income" and "financial assets," which led him to *inadvertently* provide completely inaccurate information in 2013. (*Id*., ¶ 3.)

Indeed, Ethington admits that none of the personal income information in his 2013 financial statement was correct. Specifically, rather than receiving a $50,000 annual gross salary from Ethington Management, as previously claimed, Lauren Ethington received no actual salary. (*Id.*, ¶ 6.) Indeed, neither of the Ethingtons received *any* salary from Ethington Management in early 2013; thus, his claimed $5,000 per month in after-tax salary – listed on the combined balance sheet – was false. (*Id.*, ¶¶ 6-7; Ex. 1 at 9.)

Rather than salaries, the Ethingtons received cash disbursements – either directly from Ethington Management or by using the Ethington Management account to pay their personal expenses. (Attach. A, Ostrum Dec., Ex. 28, 5/13/15 Ethington Dec., ¶¶ 6-7.) Ethington now states that he and his wife received $11,750 in cash and $29,431.59 paid personal expenses, totaling $46,529.60 in distributions from Ethington Management from January through April 18, 2013. (Attach. A, Ostrum Dec., Ex. 28, 5/13/15 Ethington Dec., ¶ 6.) This amounts to more than $13,000 in monthly net income. Thus, his income exceeded, rather than failed to meet, his claimed monthly expenses. (*See* Attach. A, Ostrum Dec., Attach 1 at 9-10 (claiming monthly expenses of $11,684.14).)

Regarding the related companies' assets, Ethington now states that his June 13, 2013, letter was "not accurate because, as of June 13, all of the listed seven entities,

contrary to the representation in the Letter, did have some cash in their bank accounts."[6] (Attach. A, Ostrum Dec., Ex. 28, 5/13/15 Ethington Dec., ¶ 4.) In fact, those accounts held $65,393.64 on that date. (*Id.*, Ex. 8 at 20; Ex. 9 at 33; Ex. 14 at 20; Ex. 15 at 21; Ex. 16 at 17; Ex. 17 at 12; Ex. 18 at 14; Ex. 19 at 6.)

In his declaration, Ethington discounts the relevance of the Zookaware settlement, claiming that the money was used to pay "routine bills" and could not have been used to reach a financial settlement with the Commission. (*Id.*, Ex. 28, 5/13/15 Ethington Dec., ¶ 8.) Specifically, Ethington states that the Zookaware settlement was "primarily used by Optimize to pay bills, during April, May and June of 2013," including "normal and customary cash distributions" to Ethington Management of $39,800 during those three months. (*Id.*, ¶ 8.) In fact, documents produced by Defendants and relevant financial records show that, from late April through August, Optimize actually paid a total of $112,134.17 in distributions to its members – ultimately the Ethingtons and Seth Hassell.[7] (Attach. A, Ostrum Dec., Ex. 29 (showing distributions by Optimize of

---

[6] Defendants did not address the fact that Ethington claimed $1,000 per month in "rental property" expenses that they now concede were actually member assessments for his separate PRE Properties, LLC, business. (Attach. A, Ostrum Dec., Ex. 1 at 9 (listing "Rental Property Expenses" of $1,000 per month); Ex. 33 at 7 (stating that the payment was a "monthly owner assessment to cover mortgages and other business expenses" of PRE Properties).) PRE Properties used those assessments, in part, to pay mortgages on two real properties it owned in April 2013, neither of which was disclosed by Ethington either in his financial statement or in his May 2015 "corrected" information. (*See id.*; *see also* Ex. 1, 28 (failing to include any reference to properties owned by PRE Properties).)

[7] This figure does not include $8,000 Optimize paid to Ethington Management on April 15, 2013, or $4,000 it paid to the company on April 23, 2013, (Attach. A, Ostrum Dec., Ex. 14 at 15; Ex. 15 at 15), nor does it include another $38,000 paid to Ethington and

9

$57,300 to Ethington Management and $55,134.17 to the "other owner" for April 23-August 31, 2013); Ex. 14 at 14-32 (Optimize bank statements showing transfers to accounts held by Ethington Management, Seth Hassell, and Hassell's Truly Imagine, as well as a credit card payment made on behalf of Hassell and a $10,000 check written to Hassell); Ex. 15 at 14-26; Ex. 23 at 12, 15-16; Ex. 21 (letter from First Bank identifying the account ending in 3041 as belonging to Seth Hassell).)  Thus, Optimize had over $100,000 *in cash* that could have been used to reach a financial settlement with the Commission.  Instead, that money went into Ethington's and Hassell's pockets.

### C. Additional Misrepresentations and Omissions Defendants Have Not Admitted

Despite providing newly "revised" financial information, Defendants continue to provide an inaccurate and incomplete picture of their financial condition in 2013.

#### 1. Ethington's "revised" financials still contain numerous misrepresentations and omissions.

Defendants continue to understate Ethington's actual income.  Ethington now admits to receiving approximately $13,000 per month in distributions from Ethington Management.  However, Ethington Management's records show that it paid numerous other personal expenses in early 2013 that Ethington still does not acknowledge.  For instance, Defendants claim that payments to a local charter school are moneys "due from Optimize."  (Attach. A, Ostrum Dec., Ex. 15 at 7, 10, 13, 16, 19 (showing checks to

---

Hassell from January through early April 2013, (*Id.*, Ex. 14 at 8-15 (showing payments to Ethington Management and Hassell's Boxed Beginnings); Ex. 15 at 8-15; Ex. 22 at 5).

Legacy Traditional Charter School[8]); Ex. 31 at 4.)  They claim that numerous downloads from iTunes are computer expenses, (*id.*, Ex. 31 at 9-10; Ex. 32), and that trips to Costco – amounting to almost $7,000 in eight months – are for "office supplies" for an at-home business with no employees other than themselves (*id.*, Ex. 31 at 10-11; Ex. 32). Properly attributing these additional "business expenses" to the Ethingtons, they received as much as $120,000 in cash distributions and other compensation from Ethington Management between January and April 2013, resulting in net monthly income of approximately $15,000 that is still unreported.

Moreover, even if it were appropriate to exclude "working capital" from a report on Optimize's assets, which it is not, Optimize did not use the Zookaware settlement to pay its ordinary business expenses.  Instead, between receipt of the final Zookaware payment on April 10, 2013, and Defendants' signing the HCG Diet Direct financial statements on April 23, Optimize transferred more than $130,000 to pay off various credit cards, including almost $110,000 toward cards held by other companies owned by Seth Hassell.[9]  (Attach. A, Ostrum Dec., Ex. 9 at 21-22 (showing payments to credit cards); Ex. 10 at 3; Ex. 27 at 3; Ex. 34 at 2 (identifying credit card accounts for Hassell companies).)  Further, financial records show that someone withdrew $20,000 in cash

---

[8] These checks reference the name of one of the Ethingtons' minor children.  (Attach. A, Ostrum Dec., ¶ 60.)

[9] Defendants now claim that the payments to Seth Hassell's companies' credit cards were to repay "borrowed credit."  (Attach. A, Ostrum Dec., Ex. 34 at 2.)  Even assuming that is true, these payments do not constitute "ordinary business expenses;" they are ongoing debts that Defendants *wanted* to use Optimize's cash to pay, instead of using the money to settle this litigation.

from the Optimize account the day Ethington signed HCG Diet Direct's financial statement, a fact Defendants have never admitted.  (Attach. A, Ostrum Dec., Ex. 9 at 22.)

These distributions, payments, and withdrawals are not "ordinary" business expenses but rather reflect Defendants' choice to use available cash to satisfy Hassell's and Ethington's personal interests.  Even setting aside the money used to pay Optimize's credit card, from late April through August 2013 – the time period immediately following receipt of the Zookaware settlement – Optimize spent more than $250,000 *in cash* on voluntary payments to its members – Ethington and Hassell.

### 2.  HCG Diet Direct still misrepresents its 2013 financial condition.

HCG Diet Direct's financial records show that Ethington operated it as part of a larger business enterprise with related businesses whose assets were relevant to the Commission's agreement to suspend the entire monetary judgment.  At the time of HCG Diet Direct's June 2013 financial supplement, those related companies had significant assets that Defendants hid in three ways.

First, Defendants misrepresented the related companies' total assets as of the June 13, 2013 supplemental statement.  Specifically, they claimed only Optimize held *any* non-financial assets, and those were limited to $3,000-$4,000 in desks and computers. (*Id.*)  In a newly-provided balance sheet, Defendants now list assets for Ethington Management of $66,375.46, not including the money held in its bank account.  (*Id.*, Ex. 30 at 2).  Similarly, Optimize's April 18, 2013 balance sheet lists assets – aside from

$132,750.34 in its bank accounts – with a value of $80,928.62, including $5,890.82 in furniture and equipment. (Attach. A, Ostrum Dec., Ex. 33 at 2.)

Second, while the FTC has not uncovered the extent of comingling between the related companies, it is clear that Ethington and Hassell moved money between the entities at will. This is highly relevant for two reasons. If they treated the companies as part of a single enterprise and commingled the financial accounts, then the company should have disclosed that fact and produced the relevant financial records for all of the related companies as part of its financial statement. By failing to do so, HCG Diet Direct presented an incomplete picture of its financial condition in 2013. Moreover, the fact that the companies were treated as part of a larger business enterprise further supports the fact that the Optimize cash could have been used to settle this litigation.

It is impossible to get an accurate picture of HCG Diet Direct's financials without examining the financial records of the related companies because Ethington and Hassell commingled the accounts. For example, they routinely used the Easy Payment Services' account as a middleman for payment of various expenses for the related companies, including HCG Diet Direct. (Attach. A, Ostrum Dec., Ex. 28, ¶ 8.) Indeed, from January through April 2013, HCG Diet Direct transferred more than $55,000 to Easy Payment Services. (Attach. A, Ostrum Dec., Ex.13 at 5-19 (showing checks and wire transfer to "EPS.") From January through April 18, 2013, HCG Diet Direct also transferred almost $40,000 to Optimize. (*Id.*) Then, from April through August 2013, the money moved the opposite direction, and Optimize made multiple payments toward HCG Diet Direct credit

cards. (*Id.*, Ex. 9 at 21-43 (showing payments to HCG Diet Direct credit card ending in 2145); Ex. 26 at 15-32.) Optimize also made the credit card payments discussed above, totaling almost $110,000 between April 17 and 23, 2013,[10] for cards held by three other entities owned by Seth Hassell: Circular Motions, LLC; Manta Ray Investments, LLC; and The Sole Investment Company, LLC.[11] (Attach. A, Ostrum Dec., Ex. 9 at 21-22 (showing payments to credit cards); Ex. 34 at 2 (identifying credit card accounts for Hassell companies); Ex. 50.)

The other related companies were also involved in these money transfers. For example, from January through April 2013, Prescription HCG, Growth Hormones Direct, and NovusOP deposited approximately $11,000 into the HCG Diet Direct account and more than $18,000 into the Optimize account.[12] (Attach. A, Ostrum Dec., Ex. 13 at 5-19; Ex. 14 at 5-15; Ex. 16 at 5-13; Ex. 17 at 5-10; Ex. 18 at 5-13.) Hassell and Ethington treated the companies as related parts of a single enterprise and transferred funds between

---

[10] In March and May 2013, Optimize made additional payments toward these credit cards. These payments were made by check rather than electronic transfer, and the payors listed on the checks *drawn from the Optimize* account were changed from Optimize to Circular LLC, Manta Investments, and Seth Hassell. (Attach. A, Ostrum Dec., Ex. 9 at 13-16, 25-28; Ex. 10 at 1-2, 4.)

[11] Seth Hassell used Circular Motions to hold his 50% interest in Growth Hormones Direct and used Manta Ray Investments to hold his 50% interest in Prescription HCG. (Attach. A, Ostrum Dec., Exs. 35, 37, 39, 44, 46.)

[12] In April 2013, Prescription HCG began making deposits from a Square, Inc., merchant account, totaling approximately $38,000 from April through July 2013. (Attach. A, Ostrum Dec., Ex. 16 at 12-21.) These deposits were Prescription HCG's only source of income at that time. (*Id.*) During that same period, Prescription HCG transferred almost $35,000 to HCG Diet Direct. (*Id.*; *see also* Ex. 13 at 18-29.)

the various financial accounts – and to themselves – at will.  As a result, HCG Diet Direct's financial representations failed to disclose accurate and complete information.

Third, HCG Diet Direct presented itself as a company on the verge of shutting down – limited income, no employees. (Attach. A, Ostrum Dec., Ex. 2 at 13 (listing no employee compensation); Ex. 3 at 7.)  In reality, mere days after completing its financial statement, the company paid $7,000 on a bond to open a brand new merchant account, from which it started receiving income in July 2013.  (*Id.*, Ex. 13 at 22-29.)  Obviously, HCG Diet Direct was not in the process of shutting down but rather presented that image only long enough to complete its financial statement to the FTC.

And HCG Diet Direct was not alone.  At least three of the other related companies also had ongoing income from merchant accounts in early 2013.  (*Id.*, Ex.14 at 5-29; Ex. 16 at 5-21; Ex. 17 at 5-9.)  Indeed, Prescription HCG – which Defendants claimed was "not active" in Item 8, (*id.*, Ex. B at 16) – deposited merchant account payments every month from January through August 2013, (*id.*, Ex. 16 at 5-21.)  Again, Defendants did not disclose these income streams as assets when asked about the related companies.

## III. DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS ARE MATERIAL AND REQUIRE LIFTING THE SUSPENSION OF THE JUDGMENT

Defendants made countless material misstatements and omissions in their 2013 financial representations.  The Commission explicitly relied on those representations in agreeing to a suspended monetary judgment.  Per the express terms of the Stipulated

15

Judgment, the FTC is entitled to have the judgment suspension lifted, making Defendants jointly and severally liable for $3,212,310.00 in consumer redress.

The Stipulated Judgment specifies that the FTC's agreement to suspend the judgment was "expressly premised on the truthfulness, accuracy, and completeness of the sworn financial statements and related documents . . . submitted to the Commission," including Ethington's April 18, 2013 individual financial statement, HCG Diet Direct's April 22, 2013 corporate financial statement, the June 13, 2013 Letter Addendum, and the various attachments. (Dkt. #5, Stip. Jgmt. at 11). Had the FTC known that HCG Diet Direct had an ongoing income stream – and was simply in-between merchant accounts at the time, that Ethington had far greater income and financial interests than disclosed, and that the related companies had extensive financial and non-financial assets at the time of the settlement, it would have affected the FTC's agreement to a settlement suspending the *entirety* of a judgment representing more than $3 million worth of consumer loss.

Moreover, the Defendants knew the information they withheld or misstated was material.[13] Ethington obviously knew how much money he was receiving from Ethington Management, as well the total the company was paying on his behalf. Yet, he underreported his income falsely to claim that his expenses significantly exceeded that

---

[13] A representation, omission, or practice is material if it is "likely to affect a consumer's choice of or conduct regarding a product." *In re Thompson Med. Co.*, 104 F.T.C. 648, 788 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986); *see also FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) ("A misleading impression . . . is material if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.").

income.  Further, Ethington failed to disclose any assets or income streams for the *seven* companies he and his wife, through Ethington Management, jointly owned with Seth Hassell.  He did so even though the companies had almost $150,000 in their bank accounts on the same day he signed his financial statement and had spent more than $120,000 the day before to pay off credit card debt.

HCG Diet Direct affirmatively lied about the assets held by the related companies, in response to a direct and specific inquiry from the FTC.  There can be no doubt that Defendants knew $65,393 held in cash in the companies' accounts, $66,375 in other assets held by Ethington Management, and almost $80,000 in additional assets held by Optimize was material; they disclosed that Optimize held $3,000-$4,000 in certain non-financial assets.  (Attach. A, Ostrum Dec., Ex. 4.)  Thus, Defendants knew that even a fraction of the more than $200,000 in withheld assets was a material amount.

## IV.    CONCLUSION

Pursuant to the Stipulated Judgment, the suspension should be lifted, and Defendants should be held jointly and severally liable for the full amount of the judgment, $3,212,310.00, plus interest accrued since January 7, 2014.

Dated:  September 15, 2015	Respectfully Submitted,


	__/s/ Korin Ewing Felix_____

	KORIN EWING FELIX
	600 Pennsylvania Ave. NW
	Mail Drop CC-9528
	Washington, DC  20580
	(202) 326-3556
	(202) 326-3197 (Facsimile)
	kfelix@ftc.gov

	Attorney for Plaintiff
	FEDERAL TRADE COMMISSION

CERTIFICATE OF SERVICE

      This is to certify that on September 15, 2015, I caused true and correct copies of the **FEDERAL TRADE COMMISSION'S MOTION TO LIFT SUSPENSION OF JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF and the attachments thereto** to be served on all counsel of record by filing the documents electronically with the clerk of the court using the CM/ECF system, which will send a notice of electronic filing to interested parties, including, but not limited to, the following:

James R. Prochnow
Greenberg Traurig, LLP
The Tabor Center
1200 17th Street
Suite 2400
Denver, CO  80202
prochnowj@gtlaw.com

      __/s/ Korin Ewing Felix_____
      Korin Ewing Felix
      Attorney for Plaintiff
      Federal Trade Commission